J-A08011-25
J-A08012-25
J-A08013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DERRICK CHAPPELL | : | No. 1256 EDA 2024 |

Appeal from the PCRA Order Entered March 28, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0003607-1999

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| SAM GRASTY | : | No. 1257 EDA 2024 |

Appeal from the PCRA Order Entered March 28, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0003608-1999

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| MORTON JOHNSON | : | No. 1258 EDA 2024 |

Appeal from the PCRA Order Entered March 28, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0003609-1999

BEFORE: LAZARUS, P.J., McLAUGHLIN, J., and SULLIVAN, J.

J-A08011-25
J-A08012-25
J-A08013-25

MEMORANDUM BY SULLIVAN, J.:                    **FILED JULY 22, 2026**

The Commonwealth appeals from the order, entered pursuant to the Post Conviction Relief Act ("PCRA"),[1] granting new trials to Derrick Chappell ("Chappell"), Sam Grasty ("Grasty"), and Morton Johnson ("Johnson") (collectively, "the petitioners"), who were each convicted at separate trials for burglary, conspiracy, and the murder of Henrietta Nickens ("Nickens" or, alternatively, "the victim"). The PCRA court granted the petitioners a new trial, holding DNA tests conducted in 2021 excluded petitioners as contributors to DNA found in/around the victim's body, and concluding this "new evidence" would allow petitioners to argue "the murder was committed by a single perpetrator" and excluded them ("single perpetrator theory") pursuant to 42 Pa.C.S.A. § 9543(a)(2)(vi). PCRA Court Opinion, No. 3607-99 (Chappell), 6/17/24, at 6. The PCRA court came to this conclusion, notwithstanding that the DNA evidence was linked at the petitioners' trials to the same person, Unidentified Male #1 ("UM1"), and without a single reference to the trial records. The PCRA court's analysis is in contravention to the clear holding in ***Commonwealth v. Murchison***, wherein Justice Wecht noted "the only way to assess the likelihood that after-discovered evidence will produce a different result is to review the totality of all the trial circumstances, including, but not

_____

[1] ***See*** 42 Pa.C.S.A. §§ 9541-9546.

- 2 -

limited to, the trial evidence and the parties' closing arguments." 328 A.3d 5, 18 (Pa. 2024).

It is clear upon review of the trial records[2] that each petitioner submitted DNA samples to law enforcement pre-trial, all three petitioners' DNA was compared to the DNA collected at the crime scene, and all three were excluded as contributors to physical evidence found at the crime scene; further, it is clear from the testimony at trial that defense counsel argued the single perpetrator theory and lack of physical evidence implicating the petitioners at trial*.*  Because petitioners already had DNA evidence excluding them as contributors to the DNA found in the victim's body, and argued at their individual trials that the DNA evidence exonerated them, we conclude, based on the unanimously decided ***Murchison***, 328 A.3d at 19-20, the PCRA court erred in finding that the 2021 DNA evidence was after-discovered evidence within the meaning of the PCRA, specifically, as it erred in concluding that the evidence was not cumulative and would likely compel a different verdict.[3]

_____

[2] Each petitioner had a separate trial due to a motion to sever granted by the trial court.

[3] As Justice Wecht aptly notes in ***Murchison***, where newly tested DNA evidence is merely corroborative or cumulative of the trial evidence, proof of a different verdict is unlikely; and where the post-conviction DNA testing evidence neither places the petitioners at the scene of the crime nor excludes them, it is "evidentiarily neutral," and thus does not undo witness testimony, and it is unlikely to warrant a different result.  328 A.3d at 19-20.

Notably, the PCRA court failed to adhere to **Murchison**'s directive that newly discovered evidence be weighed against the evidence and arguments at trial; instead, the PCRA court manifested no review of the trial record, but instead relied on just the PCRA testimony and expert reports. Because of the trial court's improperly truncated review of the record, and its erroneous conclusions regarding whether the new DNA evidence was cumulative and would likely compel a different verdict, we reverse.

The relevant testimony at the petitioners' separate trials established the following:[4] One day in October 1997, the petitioners and Richard McElwee ("McElwee") went to Nickens's home. McElwee stood lookout while the petitioners entered the home and emerged approximately fifteen minutes later with $30. Chappell and Johnson told McElwee that Grasty hit Nickens. **See** Trial Court Opinion, No. 3607-99 (Chappell), 6/21/01, at 3. The victim's daughter, Carlotta, discovered her mother's body the next day, face down on the floor. Upon arrival, the police saw the back door had apparently been kicked in and found a green men's jacket in the home. **See** Trial Court

---

[4] Although it is not evident from the PCRA court opinion, it is important to note, each petitioner had a **separate** trial, as the result of the trial court's grant of a motion to sever. **See**, **e.g.**, Order, No. 3607-99 (Chappell), 8/25/00 (granting Chappell's motion to sever from his co-defendants). In all, there were four trials: petitioner Grasty's first trial resulted in a hung jury, but a jury convicted him at his second trial. Thus, three separate factfinders--two juries and a judge--found each petitioner guilty of murder, burglary, and conspiracy beyond a reasonable doubt.

Opinion, No. 3608-99 (Grasty), 7/23/01, at 3. Dimitri Contostavlos, M.D.

("Dr. Contostavlos") conducted a post-mortem examination the day Nickens's

body was found. **See**, **e.g.**, N.T., No. 3607-99 (Chappell), 7/25/23, Ex. C-1

(1997 medical examiner's report); N.T., No. 3607-99 (Chappell), 9/15/00, at

8. The undisputed cause of death was cardiac and pulmonary physiologic

changes (shock) caused by blunt force trauma to the face and head consistent

with blows from a fist or other object "of not great weight." N.T., No. 3607-

99 (Chappell), 9/15/00, at 14-15. **See also** Trial Court Opinion, No. 3608-99

(Grasty), 7/23/01, at 3-4; N.T., No. 3609-99 (Johnson), 12/20/01 at 13.[5]

At trial, Nickens's granddaughter testified Grasty knew Nickens because

he was dating her, the granddaughter, Grasty had argued with Nickens in the

week before her murder, he did not like her, and he had previously threatened

her. **See** Trial Court Opinion, No. 3608-99 (Grasty), 7/23/01, at 4. Eric Lewis

("Lewis") testified that the evening before the crime, he heard the petitioners

discussing a plan to rob someone. **See id**. at 5.[6] Another witness, Donetta

---

[5] To the extent the dissent suggests definitively that Nickens was killed by a "closed fist," our review discloses the record does not support this fact. **Cf**. Concurring and Dissenting Memorandum at 5.

[6] Lewis lived in the projects across the street from Grasty and was approximately thirteen years old at the time of the crime. **See** N.T., No. 3608-99 (Grasty), 12/13/00, at 14. He testified he was smoking marijuana with the petitioners in front of an abandoned house when he heard Grasty talking about how "somebody was going to get robbed . . . and they weren't going to suspect that he did it." **Id**. at 20. Lewis stated that the jacket found at the
*(Footnote Continued Next Page)*

- 5 -

Thompson ("Thompson") told the police she overheard the petitioners discussing their involvement in the murder. *See id*. at 4.[7] Witness James Dennis ("Dennis"), an acquaintance of Chappell's, testified that Chappell told him he "had a body," *i.e.*, that he had "killed somebody." N.T., No. 3607-99 (Chappell), 9/18/00, at 62. Chappell described to Dennis the crime, including McElwee as the lookout, and taking thirty dollars from "the lady," whom the petitioners hit on the head. *Id*. at 63. Chappell also described the victim as wearing a nightgown and with no underpants. *See id*. Carl Gethers ("Gethers"), also a witness at Grasty's trial, gave a statement to Detective Todd Nuttall ("Detective Nuttall") describing a conversation in a Chinese restaurant in which Grasty, whom he knew, stated he had paid McElwee $15 to be a look out while he and Johnson "went in the crib and knocked the lady over," he was the one who "knocked her over," and he bragged that he did

_____

crime scene was similar to one worn by Johnson. *See* Trial Court Opinion, No. 3608-99 (Grasty), 7/23/01, at 5.

[7] Thompson was inside an abandoned house at the time she heard the petitioners talking about the crime; exactly what she was doing in the house at the time is unclear. *See*, *e.g.*, N.T., No. 3607-99 (Chappell), 9/18/00, at 34.

not believe he was going to jail because of the lack of "fingerprints or anything from me." N.T., No. 3608-99 (Grasty), 12/13/00, at 207-08.[8,9]

The autopsy also revealed the presence of semen in Nickens's rectum, deposited by Unknown Male 1 ("UM1"), though there were no other indicia of

_____

[8] Gethers lived in Grasty's neighborhood, was on friendly terms with him, and frequented the same Chinese food restaurant. *See* N.T., No. 3608-99 (Grasty), 12/13/00, at 73-75. Gethers, in his statement to Detective Nuttall, indicated he heard Grasty's inculpatory statements at that restaurant. *See id*. at 207.

[9] The concurring and dissenting memorandum suggests Grasty's statement was hearsay. *See* Concurring and Dissenting Memorandum at 8 n.2. However, the trial court, over Grasty's objection, ruled the statement admissible under two different hearsay exceptions, including the recorded recollection exception. *See* N.T., 12/13/00, at 186-90. Grasty raised this issue on direct appeal, and this Court affirmed the admission of the statement under this exception. *See Commonwealth v. Grasty*, 808 A.2d 244 (table), No. 1667 EDA 2001, at 15-16. Thus, any argument that Grasty's admission was inadmissible hearsay is previously litigated, and this Court may not consider it. *See* 42 Pa.C.S.A. § 9543(a)(3) (providing that previously litigated claims are ineligible for PCRA relief); *Commonwealth v. McCready*, 295 A.3d 292, 296 n.3 (Pa. Super. 2023) (holding that a claim raised on direct appeal and found to be meritless by this Court is previously litigated for PCRA purposes). In any event, our review indicates Grasty's present PCRA claim does not implicate any error below with respect to this ruling, and this Court may not consider it *sua sponte*. *See* Amended PCRA Petition, 6/21/23, at 59-77 (claims for relief); *see also*, *e.g.*, *Commonwealth v. Lambert*, 797 A.2d 232, 241 (Pa. 2001) (holding that "claims . . . not raised in [a] PCRA petition . . . are waived for that distinct reason"). These are two independent grounds (*i.e.*, previously litigated and waiver) for rejecting any error with respect to this evidence.

Further, while the concurring and dissenting memorandum asserts that Grasty's statement does not rebut the absence of, *inter alia*, McElwee's DNA in Nickens's apartment, *see* Concurring and Dissenting Memorandum at 8 n.2, we note that McElwee was the lookout and did not enter the apartment.

physical injury to her rectum or internal to her vagina. **See** Trial Court Opinion, No. 3608-99 (Grasty), 7/23/01, at 4; N.T., No. 3608-99 (Grasty), 12/14/00, at 15;[10] N.T., No. 3609-99 (Johnson), 12/20/01, at 15-16, 20-21. Notwithstanding the semen in her rectum, there was no "evidence whatsoever that [she] was anally raped." N.T., No. 3608-99 (Grasty), 12/14/00, at 16.

Johnson and Grasty submitted blood samples sent to a Pennsylvania State Police ("PSP") lab for DNA testing in December 1997. **See**, **e.g.**, N.T., No. 3607-99 (Chappell), 7/25/23, at Ex. JD-4 (unnumbered at 6-7) (PSP reports). Chappell submitted a blood sample for DNA testing in January 1998. **See id**. (unnumbered at 11). The DNA of all three petitioners was compared to the semen found at the scene and all three were excluded as contributors to the DNA found. In light of these findings and the undisputed conclusion that the cause of the victim's death was medical complications as a result of blunt force trauma, the Commonwealth charged petitioners with murder, burglary, conspiracy, and related crimes.

Similar to **Murchison,** the Commonwealth's theory and evidence did not advance a sex crime. At no point did the Commonwealth claim petitioners raped or sexually assaulted the victim.

---

[10] While there was "slight bruising" to the exterior of Nickens's vagina, no semen was detected in her vagina and there were no internal injuries to her vagina. **See** N.T., No. 3608-99 (Grasty), 12/14/00, at 15.

Despite the Commonwealth not charging any sex crimes, it did not deter petitioners' counsel at each trial from presenting their theory that the individual, UM1, whose semen was found in Nickens's rectum, was also the man who killed her, notwithstanding the lack of physical injury to her rectum. *See* N.T., No. 3607-99 (Chappell), 9/19/00, at 9, 25, 28 (closing argument); N.T., No. 3608-99 (Grasty), 12/14/00, at 152-53 (closing); N.T., No. 3609-99 (Johnson), 12/20/01, at 139-40, 162 (closing). At their individual trials, each petitioner presented evidence establishing DNA tests excluded him and his cohorts as contributors of the semen found in the victim's rectum. *See*, *e.g.*, N.T., No. 3607-99, 9/18/00, at 95-97 (parties' trial stipulation DNA testing excluded Chappell as a contributor of the semen, and that a blanket, bed sheet, and towel had blood on them, were tested, and the genetic markers in the blood matched Nickens); N.T., No. 3608-99, 12/13/00, at 153 (testimony at Grasty's trial that DNA excluded Grasty and his cohorts as contributors of the semen);[11] N.T., No. 3609-99, 12/20/01, at 34-36 (testimony at Johnson's trial that the semen excluded him and his cohorts, blood from the pillowcase matched Nickens, blood under Nickens's fingernails was hers, and "the semen stain from the green jacket . . . was a profile that

_____

[11] Additionally, at Grasty's trial, the parties stipulated various items were DNA tested, including pillows with pillowcases, blood samples from the walls and a radiator. All the items had Nickens's genetic markers; the anal swab with seminal material taken from the victim's body excluded the cohorts. *See* N.T., 3608-99, 12/13/00, at 230-32.

was foreign to [the other cohorts]" but matched the semen from the anal swab (UM1)).

Each petitioner also argued at trial the DNA evidence which excluded him as a contributor to the semen disproved his involvement in the crime given the lack of other physical evidence. At Grasty's trial, the defense argued, "whoever raped [Nickens] killed her. That is where . . . common sense comes in." **See** N.T., No. 3608-99 (Grasty), 12/14/00, at 152-53. At Chappell's trial, the defense argued the DNA evidence was exculpatory, argued for acquittal based on the lack of fingerprints, shoeprints, and claimed that Nickens was raped at the time she was murdered, and that the rapist and murderer were the same person. **See** N.T., No. 3607-99 (Chappell), 9/19/00, at 9, 25, 28. At Johnson's trial, the defense noted that Johnson submitted his DNA which excluded him and allegedly exculpated him, declaring, "[i]t is not to be believed when [McElwee] points a finger at [] Johnson. Unsupported by one sperm, one fingerprint, one hair, one hair follicle, one skin follicle, one box that I put on the floor[,] the imaginary box with the physical evidence." N.T., No. 3609-99 (Johnson), 12/20/01, at 139-40, 162.[12] Thus, each petitioner not only possessed the UM1 DNA information at trial, they each argued that evidence exculpated them.

_____

[12] After Chappell's and Grasty's trials, but before Johnson's trial, the semen on the green jacket was tested and determined to match UM1.

Thus, despite the lack of physical injury to Nickens's rectum, the defense theory put forth in each individual trial—based on the DNA of UM1 in victim's rectum (and elsewhere)—was UM1 raped, burglarized, and bludgeoned Nickens to death (a/k/a "the single perpetrator theory"). The Commonwealth, however, did not prosecute this case as a sex crime, and noted the nature of Nickens's sexual encounter was unknown. Instead, based on the cause of death, the Commonwealth presented the testimony of multiple witnesses to prove the petitioners committed a burglary and murder motivated by Grasty's anger at the victim, and the Commonwealth obtained three separate guilty verdicts from different factfinders.

A jury convicted Chappell of second-degree murder, burglary, theft, and conspiracy. A jury convicted Grasty of second-degree murder, burglary, and conspiracy. After Johnson elected a non-jury trial, the court convicted him of second-degree murder, burglary, criminal trespass, robbery, theft, criminal mischief, and conspiracy. Following each of their convictions, petitioners were sentenced, and Chappell, following a successful PCRA challenge to his sentence, was resentenced in August 2020.[13] Grasty, following sentencing,

_____

[13] Chappell originally received a sentence of life imprisonment. After direct appeal and a series of unsuccessful PCRA petitions, the PCRA court vacated Chappell's sentence because he was a minor at the time of the offense and resentenced him to a period of twenty-eight years to life imprisonment, a sentence that was later reimposed after this Court vacated a different part of the sentence. **See** Order, 8/11/20, at 1. Thus, for purposes of the PCRA,
*(Footnote Continued Next Page)*

filed two unsuccessful PCRA petitions;[14] and Johnson filed three unsuccessful PCRA petitions.[15]

In 2021, the petitioners sought DNA testing of evidence previously collected from the crime scene, the Delaware County District Attorney's Office ("DCDA") consented to the testing and/or retesting of this evidence and turned over, pursuant to a consent order, several pieces of evidence, and the petitioners chose Forensic Analytical Crime Lab ("FACL") to conduct the DNA testing.

_____

Chappell's judgment of sentence became final on September 10, 2020, when the time expired for him to file a direct appeal from his final judgment of sentence.

[14] Grasty was sentenced on January 22, 2001, and he filed a timely direct appeal. This Court affirmed Grasty's judgment of sentence on July 15, 2002, and our Supreme Court denied his petition for allowance of appeal on December 18, 2002. *See Grasty*, 813 A.2d 838 (Pa. 2002). Thus, for the purposes of the PCRA, Grasty's judgment of sentence became final on March 18, 2003, when the time expired for him to file a writ of *certiorari* in the United States Supreme Court. *See* 42 Pa.C.S.A. § 9545(b)(1)(3); Sup. Ct. R. 13. Grasty subsequently filed two unsuccessful PCRA petitions. We note that Grasty's prior DNA evidence challenges were based upon the after-discovered evidence, presented at Johnson's trial, that the green jacket did not contain any of the petitioners' DNA.

[15] Johnson filed a direct appeal on July 17, 2002, and this Court affirmed his judgment of sentence on August 14, 2003. On December 30, 2003, our Supreme Court denied Johnson's petition for allowance of appeal. *See id*., 680 MAL 200 (Pa. 2003). Thus, for purposes of the PCRA, Johnson's judgment of sentence became final on March 29, 2004, when the time expired for him to file a writ of certiorari in the United States Supreme Court. *See* 42 Pa.C.S.A. § 9545(b)(1)(3); Sup. Ct. R. 13. Johnson subsequently filed three unsuccessful PCRA petitions.

Notably, although the majority of the items the petitioners sought to have tested had already been tested before trial for DNA, and each petitioner had presented a trial defense based on the results of those DNA tests, for reasons unclear from the record, DCDA consented to the DNA re-testing of this evidence, and the parties agreed to re-testing of the following items:

    a. XXL green jacket and contents (hair, straw, tissues, glassine packet, ziplock, cigarettes)

    b. Cuttings taken from jacket in prior testing at the Pennsylvania State Police

    c. DNA extracts of samples from green jacket and DNA extracts of . . . Nickens'[s] body swabs prepared by the Pennsylvania State Police

    d. Swabs and smears [from] Nickens

    e. Reference blood samples [from] Nickens

**See** Stipulated Consent Order for Transfer of Evidence for Testing and Consolidation of Cases, 4/29/21; **see also** Order for Transfer of Evidence for Testing and Consolidation of Cases, 4/29/21.[16]  On January 12, 2022, the Forensic Analytical Crime Lab ("FACL"), chosen by the petitioners to conduct

---

[16] The straw was apparently the only item from inside the jacket that was tested.  **See** N.T., 7/25/23, Ex. JD5, at 2.  We note that notwithstanding the specific items delineated in the consent order, for unexplained reasons, and in apparent disregard of the order's requirement that any further testing "be the subject of a separate agreement or Order of the Court," **see** Order, 4/28/21, at ¶ 8, DCDA provided, and FACL examined and/or tested, additional items including a bed sheet, blanket, and Nickens's underwear and nightgown.

the new round of DNA testing, completed its tests and authored its report. *See* FACL DNA Report, 1/12/22, at 1-37. In total, FACL ended up testing twelve items submitted to them pursuant to the stipulated order, *see id*. at 4-5, ten of which had been previously tested prior to trial, and only two of the items had not been tested prior to trial (*i.e.*, the straw and the nightgown). The results of the newly tested items produced either a UM1 match, or were inconclusive. *See id*. at 2.

Four months later, in May 2022, the Petitioners filed the instant PCRA petitions,[17] in which they alleged that new DNA evidence, discovered by FACL and included the FACL DNA Report, specifically excluded them and identified the DNA of UM1 on every piece of evidence tested. *See* PCRA Petition, 5/18/22, at 26-27; *see also id*. at 23-24 (summarizing DNA evidence at trial).[18] The petitioners argued the new DNA evidence could not have been obtained prior to the conclusion of trial by reasonable diligence because the DNA testing methods employed in 2021 did not exist at the time of trial. *See id*. at 34-35; *see also id*. at Exhibit 18 (Alan Keel Affidavit). The petitioners

_____

[17] Chappell, Grasty, and Johnson filed their instant PCRA Petitions on May 18, 2022, May 16, 2022, and May 18, 2022, respectively. For ease of reference, and because the petitions are substantially identical, we cite primarily to Chappell's PCRA petition and Chappell's Amended PCRA Petition, which we cite as "PCRA Petition" and "Amended PCRA Petition," respectively.

[18] The Commonwealth has represented, and there is no dispute, that the semen DNA found in Nickens's rectum has been run through CODIS since the inception of this case, and to date has not produced a match.

further asserted the new DNA evidence could not have been obtained at the time of trial because the methodologies used in 1998 and 2001 could only obtain DNA from "genetically rich sources such as semen and blood" and not from items that were touched, such as the straw or Nickens's underwear. *See id*. at 35-36.

Additionally, the petitioners contended the new evidence was not merely corroborative or cumulative, would not be used solely for impeachment purposes, and would likely result in a different verdict if a new trial were granted. *See id*. at 36. The petitioners, however, acknowledged that they provided DNA samples pre-trial, and the evidence introduced at their respective trials excluded them as contributors of the semen in Nickens's rectum and, later, the semen on the green jacket. *See id*. at 23-24, 36. However, the petitioners argued that FACL's DNA Report revealed not only that UM1 was the sole contributor of the semen found in Nickens's rectum and on the green jacket, but also that UM1 was the habitual wearer of the jacket, as well as the person who used the red plastic straw found in the jacket. *See id*. at 27, 36-37.[19] As a result of FACL's testing, the petitioners asserted that

_____

[19] In total, FACL found that UM1 was the sole contributor of DNA found on: the chewed red plastic straw; the semen found on the green jacket; the non-sperm DNA found on the green jacket; the semen stain on the bed sheet; and the non-sperm DNA on the bed sheet. *See* PCRA Petition, 5/18/22, at 27-28, 37-38.

the 2021 DNA evidence supports a theory that Nickens was sexually assaulted and killed by one perpetrator, not three. *See id*. at 37-39. The petitioners argued that the "new" DNA evidence shows none of their DNA was present on any of the items recovered from the crime scene, and that all of those items had UM1's DNA profile. *See id*. at 38-42.[20] The petitioners contended this new evidence is of an elevated character, compared to the DNA evidence presented at trial, due to: the number of items tested, the complete exclusion of all the petitioners and McElwee, and the fact that every item tested bore UM1's DNA. *See id*.

The PCRA court consolidated the instant matters. On March 7, 2023, the Commonwealth filed, one at each docket, motions to dismiss the PCRA petitions. In its motions, the Commonwealth acknowledged that the new DNA evidence was timely under 42 Pa.C.S.A. § 9543.1.[21] *See* Commonwealth's

---

[20] This was already argued at trial. *See supra* at 8-10.

[21] Section 9543.1 sets forth the procedure for a petitioner to seek post-conviction DNA testing. Our Supreme Court has explained that section 9543.1 allows convicted persons the right to apply for DNA testing of "specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction." *Commonwealth v. Hardy*, 337 A.3d 385, 390 (Pa. 2025). Pursuant to section 9543.1, an applicant is required to take certain threshold steps including, but not limited to, identifying the specific evidence at issue, consenting to provide samples of bodily fluids to be used in DNA testing, providing a sworn statement of actual innocence of the crime in question and swearing that the DNA testing is sought "for the purpose of demonstrating the applicant's actual innocence." *Id*.

*(Footnote Continued Next Page)*

Motion to Dismiss, 3/7/23, at 13-15 (conceding FACL's DNA evidence's timeliness). The Commonwealth argued FACL's DNA Report results were cumulative of previous DNA testing and the only new results were the presence of UM1's DNA on the chewed red straw and on the bed sheet. *See id*. at 30-31. The Commonwealth stated that, based upon FACL's testing, the 2021 DNA testing showed only that UM1 "deposited semen on [] Nickens'[s] bed[]sheet[, in] her rectum[, and] on the green jacket," and that he had chewed on a straw. *Id*. at 32. The Commonwealth contended that the evidence was cumulative, failed to prove the petitioners' actual innocence, and did not contradict any of its trial theories. *See id*. at 32-34. In particular, the Commonwealth asserted the factfinders *were already aware at the time of trial* that someone other than the petitioners had a sexual encounter with Nickens and the jury was aware that the green jacket had been recovered from the scene. *See id*. at 35-36.

In response to the Commonwealth's motions, the petitioners sought leave to file amended PCRA petitions, which the PCRA court granted. On June 29, 2023, the petitioners filed amended PCRA petitions in which they argued that the PCRA after-discovered evidence test does not require "actual

---

Regarding timeliness, our Supreme Court has further explained that applicants are authorized to file section 9543.1 motions "at any time." *See id*. at 417-18; *see also* 42 Pa.C.S.A. §§ 9543.1(a)(1), (4). Further, our Supreme Court has recently clarified that a section 9543.1 DNA testing request is not a PCRA petition. *See Hardy*, 337 A.3d at 390.

innocence." **See** Amended PCRA Petition, 6/29/23, at 4 (citing **Commonwealth v. Payne**, 210 A.3d 299, 304 (Pa. Super. 2019) (*en banc*) (stating "the Supreme Court does not require that a petitioner establish that the after[-]discovered evidence proves his innocence beyond a reasonable doubt"); **Commonwealth v. D'Amato**, 856 A.2d 806, 823-34 (Pa. 2004) (Supreme Court stating that DNA evidence tested under section 9543.1 must satisfy four-prong after-discovered evidence test)). Additionally, the petitioners argued the evidence is not merely cumulative because, at trial, the jury heard they were excluded from the semen found in Nickens's rectum, the jury did not hear about the DNA found on the green jacket or anywhere else in the room, and the jury did not hear about UM1. **See** Amended PCRA Petition, 6/29/23, at 6. The petitioners also attached expert reports from Alan Keel ("Keel"), a forensic DNA analyst, and Professor Timothy Palmbach ("Palmbach"), a crime scene investigation expert. **See id**. at 7; **see also id**. Joint Defense ("JD") Exhibit 6 (Keel Expert Report); JD Exhibit 9 (Palmbach Expert Report). In his report, Keel concluded that the significance of FACL's DNA Report was that it tended to show UM1 wore the green jacket to Nickens's residence, assaulted her on her bed, deposited his semen in her rectum and on the bed sheet, and then left his jacket with the chewed red straw at the scene. **See** Amended PCRA Petition, 6/29/23, at 7-8; **see also** Petitioner Exhibit 1 (Keel Expert Report), at ¶ 15.

On July 25, 2023, Keel testified at the first PCRA hearing. **See** N.T. PCRA Hearing (Day 1), 7/25/23, at 1-220; **see also id**. at 47-50 (Keel qualified as an expert in Forensic Biology and DNA Analysis).[22] Keel explained that the thirty-seven-page FACL DNA Report describes the physical evidence, the testing, and the results. **See id**. at 57. Keel summarized that the FACL DNA Report determined UM1 was the sole contributor of DNA on the tested items. **See id**. at 57-92. In particular, Keel testified that FACL examined Nickens's bed sheet and detected a previously unknown semen stain. **See id**. at 60-62. Upon testing, FACL concluded that the bed sheet semen stain belonged to UM1 and had been comingled with Nickens's bodily fluids. **See id**. at 63. Keel explained the DNA of the semen found on the bed sheet matched the semen found in Nickens's rectum and that, in his opinion, both sources of semen were deposited during the same event. **See id**. at 64-66. However, when asked whether his DNA testing could disclose whether the semen and Nickens's blood were deposited at the same time on the sheet, Keel conceded the "DNA *per se* doesn't answer that question . . .." **Id**. at 148. Indeed, Keel could not say whether the "ejaculation occurred before, during, or after the beating," but inferred that "it's [the ejaculation] within that context." **Id**. at 149.

---

[22] Keel had worked at FACL, however, by the time of his testimony, Keel no longer worked at FACL, but had his own private practice. **See** N.T., PCRA Hearing (Day 1), 7/25/23, at 100-04.

Next, Keel testified that, in 1998, the PSP examined the green jacket and detected small bloodstains, but did not test those stains. *See id*. at 72-73. In 2001, the PSP examined the green jacket again, discovered the semen stain, and the resulting DNA testing excluded all three petitioners. *See id*. at 73. Keel explained that FACL tested the green jacket semen stain, the bloodstains, and other various cuttings from the jacket. *See id*. at 74-77. Keel testified that the semen stain on the jacket was not comingled with Nickens's DNA and, thus, was likely not from the sexual assault. *See id*. at 76-77. However, FACL's DNA testing of the jacket revealed that UM1 habitually wore the green jacket and had, at some point, deposited the semen on the jacket. *See id*. at 77. Keel testified that FACL also tested the straw found in the pocket of the green jacket, which had not previously been tested. *See id*. at 78. Keel explained that the DNA results from the straw showed UM1 was the sole contributor of DNA found there. *See id*. at 78-80. Keel further testified that, to his knowledge, UM1's DNA has been repeatedly run through CODIS since 1998, with no matches, and that CODIS contains only approximately 6% of the United States' population. *See id*. at 80-92.

On August 22, 2023, Palmbach testified at the second day of the PCRA hearing. *See* N.T. PCRA Hearing (Day 2), 8/22/23, at 1-156. Notably, the PCRA court did not discuss, or give any indication it considered Palmbach's crime scene analysis in its subsequent explanation for its order granting relief, but instead focused on the DNA evidence.

At the conclusion of the hearings, the PCRA court directed the parties to file proposed findings of fact and conclusions of law. *See id*. at 175. On November 20, 2023, the petitioners and the Commonwealth filed their proposed findings of fact and conclusions of law. *See* Petitioners' Proposed Findings of Fact and Conclusions of Law, 11/20/23, at 1-41; Commonwealth's Proposed Findings of Fact and Conclusions of Law, 11/20/23, at 1-49.[23] The petitioners thereafter filed responses to the Commonwealth's proposed findings of fact and conclusions of law. *See* Petitioners' Response to Commonwealth's Proposed Findings of Fact and Conclusions of Law, 1/16/24, at 1-13.

On March 28, 2024, the PCRA court entered orders on each docket vacating the petitioners' convictions and granting new trials. *See* Order, 3/28/24, at 1. The Commonwealth filed timely notices of appeal and court-ordered Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal.[24]

_____

[23] We note that the Petitioners also requested that the PCRA court rule on an "actual innocence claim." *See* Petitioners' Proposed Findings of Fact and Conclusions of Law, 11/20/23, at 1-41. However, the PCRA court declined to do so, and that issue is not before this Court.

[24] We note that the Commonwealth's Rule 1925(b) statements state "[t]he [PCRA c]ourt erred by granting [the petitioners'] PCRA petition[s] and ordering a new trial." Commonwealth's Concise Statement of Errors Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b), 5/21/24. However, the Commonwealth urges this Court to overlook its impermissibly vague Rule

*(Footnote Continued Next Page)*

In all three of its appellate briefs, the Commonwealth raises the same claim for our review: "Did the PCRA court err when it granted [Petitioners] new trial[s] based on previously available evidence that rendered [the petitioners'] claim[s] time[-]barred, was not [']after-discovered[,']exculpatory or likely to result in a different outcome, and where [the petitioners] had already presented a single perpetrator defense?" Commonwealth's Brief, at 3.

This Court's standard of review is as follows:

> Our standard of review of a trial court order granting or denying relief under the PCRA calls upon us to determine whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record.

***Commonwealth v. Parker***, 249 A.3d 590, 594 (Pa. Super. 2021) (internal citation omitted).

_____

1925(b) statements because it was unable to "readily ascertain the reason for the [PCRA court's] ruling." ***Id*** at n.1.

Upon review, we agree with the Commonwealth that the PCRA court's order granting relief provided no factual findings or statement of reasons supporting its order. ***See*** Order Vacating Convictions and Awarding New Trial, 3/28/24, at 1. In line with our established precedent, we decline to find the Commonwealth's claims waived on this basis. ***See Commonwealth v. Zheng***, 908 A.2d 285, 288 (Pa. Super. 2006) ("If the reasons for the ruling of the [c]ourt are vague, then an appellant is forced to file an incomplete Rule 1925(b) statement and there is no violation of Rule 1925(b).").

As with all PCRAs, we must first determine whether the PCRA petitions were timely filed and, if not, whether the Petitioners have satisfied an exception to the PCRA time bar. Any PCRA petition "shall be filed within one year of the date the judgment becomes final." 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." *Id*. at § 9545(b)(3). The PCRA's timeliness requirements are jurisdictional in nature, and a court may not address the merits of the issues raised if the PCRA petition was not timely filed. *Commonwealth v. Albrecht*, 994 A.2d 1091, 1093 (Pa. 2010).

As we previously stated, Chappell's, Grasty's, and Johnson's judgments of sentence became final on September 10, 2020, March 18, 2003, and March 29, 2004, respectively. *See* 42 Pa.C.S.A. §§ 9545(b)(1)(3); Sup. Ct. R. 13. Thus, the Petitioners had until September 10, 2021, March 18, 2004, and March 29, 2005, to file timely PCRA petitions. Consequently, we conclude that the instant PCRA petitions are facially untimely.

However, Pennsylvania courts may consider an untimely petition if the petitioner can explicitly plead and prove one of the three exceptions set forth at 42 Pa.C.S.A. §§ 9545(b)(1)(i)-(iii). Those exceptions include, in relevant part, the newly discovered fact exception, *i.e.*, that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been

ascertained by the exercise of due diligence[.]" 42 Pa.C.S.A. § 9545(b)(1)(ii). Any petition invoking one of these exceptions "shall be filed within one year of the date the claim could have been presented." *Id*. at § 9545(b)(2). "The PCRA petitioner bears the burden of proving the applicability of one of the exceptions." *Commonwealth v. Spotz*, 171 A.3d 675, 678 (Pa. 2017).

In their PCRA petitions, the petitioners invoked the newly discovered facts exception to the PCRA time bar, which "renders a petition timely when the petitioner establishes that the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." *Commonwealth v. Small*, 238 A.3d 1267, 1271 (Pa. 2020) (quotation omitted).

Instantly, FACL's DNA Report became available on January 12, 2022, when FACL completed DNA testing on the above-described evidence. Subsequently, in May 2022, the petitioners filed their respective PCRA petitions, in which they raised claims based on FACL's DNA Report. *See* PCRA Petition, 5/18/22, at 1-49; Grasty's PCRA Petition, 5/16/22, at 1-69; Johnson's PCRA Petition, 5/18/22, at 1-52. The instant PCRA petitions were, thus, filed only four months after the evidence became available, well within the one-year requirement under subsection 9545(b)(1)(ii). We additionally note the Commonwealth previously conceded the timeliness of the petitioners' claims. *See*, *e.g.*, Commonwealth's Mot. to Dismiss (Chappell), 5/7/23, at 14-15 (asserting that any non-DNA-related claims are time-barred and the

- 24 -

PCRA court has no jurisdiction over them but conceding that "[t]he [c]ourt has jurisdiction to examine new DNA evidence to determine if it constitutes exculpatory evidence that would have changed the results of the trial") (emphasis added);[25] PCRA Court Opinion, 6/17/24, at 1-2. We note the PCRA court expressly found all of the petitioners' claims to be timely filed. ***See id***. Under the circumstances, we conclude that the petitioners acted diligently. Accordingly, their PCRA petitions are timely filed.[26]

Once jurisdiction has been properly invoked by establishing one of the three exceptions to the PCRA's time bar, the relevant inquiry becomes whether the claim is cognizable under the PCRA. Section 9543 delineates seven classes of allegations that are eligible for relief under the PCRA. ***See*** 42 Pa.C.S.A. § 9543(a)(2). Relevant here is the "after-discovered evidence" provision, which states that a claim alleging "the unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced" is cognizable under

_____

[25] ***See also*** Commonwealth's Mot. to Dismiss (Grasty), 2/21/23, at 12 ("The Commonwealth . . . acknowledges that the petition at bar is timely as to the claims based on the post-conviction DNA results") (emphasis in original); Commonwealth's Mot. to Dismiss (Johnson), 2/21/23, at 10 ("The Commonwealth . . . acknowledges that the petition at bar is timely *as to the claims based on the post-conviction DNA statute*") (emphasis in original).

[26] Further, the PCRA court concluded that none of the petitioners' claims were previously raised. After review, we agree with the PCRA court that none of these claims were previously litigated. Indeed, the claims only exist due to FACL's DNA report, which was not completed until January 12, 2022.

the PCRA. 42 Pa.C.S.A. § 9543(a)(2)(vi). To establish such a claim, a petitioner must plead and prove:

> (1) the exculpatory evidence has been discovered after trial and could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict.

42 Pa.C.S.A. § 9543(a)(2)(vi); *see also Murchison*, 328 A.3d at 13.

Particularly relevant here are the second and fourth prongs of the test. Regarding the second prong, cumulativeness, our Supreme Court has articulated the test as follows:

> . . . [A]fter-discovered evidence is merely corroborative or cumulative—and thus not sufficient to support the grant of a new trial—if it is of the same character and to the same material point as evidence already adduced at trial. It is clear the terms "of the same character" and "to the same point" refer to distinct qualities of evidence; to be "merely corroborative or cumulative," newly discovered evidence must tend to prove material facts that were already in evidence at trial, and also be of the same grade or character of evidence as that produced at the trial to prove those material facts. If the new evidence is of a different and "higher" grade or character, though upon the same point, or of the same grade or character on a different point, it is not "merely" corroborative or cumulative, and may support the grant of a new trial based on after-discovered evidence.

*Commonwealth v. Small*, 189 A.3d 961, 974 (Pa. 2018) (internal citation omitted). In other words, for evidence to *not* be cumulative, it needs to either: (1) relate to a particular material issue concerning which no witness has previously testified; *or* (2) be of a higher or different grade from evidence previously possessed on the same material point. *See id*. at 973 (citing

*Brown v. State*, 450 S.E.2d 821, 824 (Ga.)). Where subsequent DNA testing produces the same result, it is not of a higher grade or character. ***See***, ***e.g.***, ***Commonwealth v. Murchison***, 294 A.3d 1251, 1261-63 (Pa. Super. 2023) (*en banc*) (discussing the PCRA's conclusion that new DNA evidence was, *inter alia*, not of a higher grade or character than that admitted at trial because the results were the same as evidence admitted at trial, and affirming the PCRA court's conclusion that the evidence was cumulative), *aff'd*, 328 A.3d 5 (Pa. 2024).

To determine whether after-discovered evidence would "likely compel a different verdict" under the fourth prong, this Court considers whether the evidence would have changed the outcome of the trial if introduced. ***See Commonwealth v. Payne***, 210 A.3d 299, 302 (Pa. Super. 2019). This Court has elaborated:

> When evaluating whether a petitioner has established by a preponderance of the evidence that the after-discovered evidence would likely produce a different verdict, a court must examine the persuasiveness of the new evidence assuming the fact-finder believes it. This inquiry includes evaluations of (1) the nature of the new evidence; (2) whether, and to what extent, the new evidence is consistent or inconsistent with other trial testimony; and (3) whether, and to what extent, the new evidence is consistent or inconsistent with documentary evidence.
>
> Our Supreme Court has examined several case-specific factors, including: (1) the prosecution's theory at the original trial, and the difficulty of making this argument in light of the new evidence; and (2) the prosecutor's closing remarks, which may demonstrate the importance of the new evidence.

*Id*. (internal citations and quotations omitted). With the foregoing legal principles in mind, we proceed to the Commonwealth's arguments.

The Commonwealth argues, *inter alia*, that the "new" DNA evidence is cumulative of evidence presented at the petitioners' trials and it would not result in a different outcome. **See** Commonwealth's Brief at 28-49.

The Commonwealth disputes the petitioners' reliance on the semen evidence as alleged proof that whoever sexually assaulted Nickens also murdered her. **See id**. at 29-42. It argues the semen in Nickens's rectum is not new evidence, but cumulative of the evidence available and used at each petitioner's trial. **See id**. at 29-31. The Commonwealth argues that there is no evidence supporting the petitioners' timeline of events and that the semen evidence cannot establish that Nickens was raped before she was murdered. **See id**. at 35-36. Rather, the Commonwealth argues that the semen evidence can only support a conclusion already known to the petitioners and presented to the factfinders at their trials: that UM1 deposited semen in Nickens's rectum at some point. **See id**. Thus, the Commonwealth posits that the semen evidence is merely cumulative.

The Commonwealth additionally asserts that the semen evidence would not change the outcome of a new trial. **See id**. at 40-42. It argues that the existence of UM1's semen merely demonstrates that he deposited semen in Nickens's rectum at some point. **See id**. Further, the Commonwealth emphasizes that the factfinders already heard this argument and did not

credit it, as demonstrated by petitioners' convictions. *See id*. The Commonwealth avers that, even considering the "new" DNA evidence of semen on the bed sheet, such a finding would not compel a different trial result. *See id*. at 41. Rather, the Commonwealth posits that "[it] is entirely unsurprising that in a small apartment with no other bed or a couch, semen that matched that [from] the victim's rectum would end up on the bed[]sheet." *Id*.

Regarding the green jacket, the Commonwealth argues that the DNA evidence is cumulative and unlikely to compel a different verdict. *See id*. at 43-47. The Commonwealth asserts that "how or when the jacket arrived in the apartment is [not] germane to the limited question before this Court." *Id*. at 43. The Commonwealth supports this contention by noting that the petitioners' experts, Keel and Palmbach, testified at the PCRA hearings that the jacket was not worn by the assailant during Nickens's assault because, if the assailant had been wearing it, Nickens's DNA would almost certainly be on the green jacket. *See id*. at 44-45. Additionally, the Commonwealth avers the green jacket could have been left in the apartment during the fifteen hours after Nickens's death when the apartment was open. *See id*. at 46. The Commonwealth contends that the mere presence of more of the same DNA on the green jacket, and on the straw within the green jacket showing UM1 is the habitual wearer of the green jacket, is merely cumulative of the evidence

already used by petitioners at trial and does not show the jacket was worn or used during the assault. *See id*.

In its seven-page, virtually identical opinions across the various dockets, the PCRA court stated—based on the "significant findings" in the FACL report that UM1 contributed the DNA found on: the green jacket, the red straw contained therein, and in the semen on the bed sheet, and the petitioners were excluded as contributors—that the new DNA test results would have permitted the petitioners to advance a "single perpetrator" defense, which would likely compel a different verdict. *See* PCRA Court Opinion, 6/17/24, at 4-6. The court then cursorily declared the post-trial DNA evidence was not cumulative. *See id*. at 6-7.

Finally, despite this Court's precedential *en banc* opinion at the time in **Murchison**, 294 A.3d 1251, the PCRA court noted the matter was currently before the Supreme Court and the (PCRA) court did not have the benefit of our Supreme Court's guidance concerning the correct standard for after-discovered evidence. *See id*. at 7.

Our review discloses that the PCRA court erred as a matter of law in concluding that the evidence was not cumulative and would result in a different verdict. Initially, we emphasize our Supreme Court's direction that "the **only** way to assess the likelihood that after-discovered evidence will produce a different result is to review the totality of all of the trial circumstances, including, but not limited to, the trial evidence and the parties'

closing arguments." ***Murchison***, 328 A.3d at 17 (emphasis added). Mindful of this, we observe that although the seven-page trial court opinion asserts an "exhaustive review" of the record, the only specific facts cited and relied upon derive solely from the post-conviction PCRA hearing; the PCRA court makes no reference to the trial record. ***See generally*** PCRA Court Opinion, No. 3607-99 (Chappell), 6/18/24, at 3-6. Thus, the PCRA court's opinion fails to discuss the after-discovered evidence in the context of the ***trial evidence*** implicating the petitioners in the crime, including testimony from various witnesses that they were heard planning the robbery, or admitting to having committed it.

Further indicative of the PCRA court's failure to review the totality of the trial circumstances, the PCRA court concludes in its opinion that "[the] single perpetrator defense was not available to [petitioners] at . . . trial" because of the absence of the 2021 DNA evidence. ***Id***. at 6. A review of the trial records proves the contrary, and the closing arguments of each petitioner clearly shows that each petitioner ***did*** present a single perpetrator defense at trial. At each trial, counsel in some form argued that whoever deposited the semen in Nickens was her murderer, and because DNA testing excluded him as a contributor to the semen, he was not her murderer and did not commit the charged crimes. ***See*** N.T., No. 3607-99 (Chappell), 9/19/00, at 25, 27; N.T., No. 3608-99 (Grasty), 12/14/00, at 152-53; N.T., No. 3609-99 (Johnson),

12/20/01, at 129, 132, 138-39, 149-51. Thus, a central premise of the PCRA court's grant of relief is demonstrably incorrect.

Having concluded the PCRA court's reasoning was faulty, we proceed to consider the 2021 DNA test results. Similar to the results of the items tested pre-trial, the re-tested and even newly tested items (*i.e.*, the straw recovered from the green jacket) excluded the petitioners as contributors of DNA to the green jacket, the semen in the victim's body and on her bed sheet, and on the red straw contained in the green jacket. Both the pre-trial and 2021 DNA testing also identified the same individual (UM1) as the contributor of all of those DNA samples. Simply put, DNA re-testing yielded more of the same DNA of UM1, no DNA from petitioners, and no DNA from any other contributors. Crucially, the re-tested and newly tested evidence did not purport to demonstrate the petitioners did not commit the burglary and murder, while other evidence remained showing they committed these offenses.

Similar to the Supreme Court's factual analysis in **Murchison**, this prosecution was never charged as a sex crime; rather, the Commonwealth charged murder, burglary, and related charges. The factfinders learned at each trial that each petitioner was excluded as a source of DNA at the crime scene—however, the Commonwealth provided additional evidence from which the factfinder could conclude that this was not a rape or sexual assault (namely that lack of trauma to Nickens's rectum, where the semen was

deposited). Contrary to the PCRA court's conclusion, it was petitioners that attempted to argue this was a sex crime at trial: Based on the DNA evidence obtained at the scene, counsel argued to the factfinders that there was a single perpetrator who sexually assaulted and then brutally beat the seventy-one-year-old victim. Two juries and a judge agreed the Commonwealth proved beyond a reasonable doubt that Nickens's unknown sexual encounter was beside the point of whether the petitioners had burgled and murdered her. Multiple witnesses established motive and testified to overhearing them planning the crime and then describing or bragging about it subsequently. As noted in *Murchison*, if "witness testimony that led the jury to convict [] is not undone by the post-conviction DNA testing evidence" then the DNA evidence does not demonstrate a different outcome is likely. *Id.* at 20.

The after-discovered DNA testing shows UM1 chewed on a straw that was inside the green jacket that had previously been tested and showed UM1's DNA on it. Likewise, the bed sheet has UM1's semen on it. This is more/additional exculpatory evidence that is of the same grade or character of the exculpatory evidence previously known and used at trial making it cumulative of petitioners' initial trial theory of a sex assault and beating executed by the same individual. None of the post-trial DNA evidence undoes the witness testimony that supported the Commonwealth's burglary, beating, and murder theory; thus, similar to the conclusion in *Murchison*, the DNA evidence is "evidentiarily neutral."

As such, we conclude the petitioners' DNA evidence is cumulative. For demonstrative purposes the following chart compares the items DNA tested pre-trial and their results, and the items DNA tested in 2021 and their results:

**Table 1. Summary of DNA Evidence**

| Crime Scene Evidence Collected | DNA Tested Prior to Trial | Results | Co-Defendants' DNA Present? | (Re)Tested by FACL (2021) | Results | Co-Defendants' DNA Present? | Diff. /Add'l Results |
|---|---|---|---|---|---|---|---|
| Victim's anal swab | Y | UM1 | N | N | — | — | N (still only UM1) |
| Green Jacket (cuttings) | Y (J) | UM1 | N | Y (retest) | UM1 | N | N (still only UM1) |
| Green Jacket (contents) | N | — | — | Y (straw only) | UM1 | N | Y (UM1) |
| Bedsheet | Y | Victim's blood | N | Y (retest) | UM1 (semen) | N | Y (UM1) |
| Victim's underwear | Y | Unknown | N | Y(retest) | Inconclusive | N | N |
| Yellow / gold blanket | Y | Victim's blood | N | Y (retest) | No semen (no further testing) | N | N |
| Bath towel | Y | Victim's blood | N | Y (retest) | No semen (no further testing) | N | N |
| Victim's nightgown (dress) | N | — | — | Y | No semen (no further testing) | — | N |
| Pillows (blood hairs) | Y | Victim's DNA (partial) | N | N | — | — | N |

Sources: ***Chappell***, No. 3607-99, N.T., 9/18/00, at 95-99 (oral stipulation regarding DNA testing); ***id***. at C-13 (written stipulation).

***Grasty***, No. 3608-99, N.T., 12/13/00, at 230-34 (oral stipulation regarding DNA testing); ***id***. at C-16 (written stipulation).

***Johnson***, No. 3609-99, 12/20/01, at 23-46 (testimony by Dr. Go and Ms. Sarah Kucherer regarding DNA testing); ***id***. at C-21 (lab report index).

***Chappell et al.*** (joint PCRA hr'g), N.T., 7/25/23, Ex. JD5 (FACL Lab Report); ***id***. at JD-6 (Alan Keel Aff.).

Note: "J" denotes Johnson; "UM1" denotes Unknown Male 1.

DNA evidence admitted at petitioner's trials, and ***which formed the basis of each petitioner's defense***, already proved the petitioners were not contributors to the DNA found in the victim's body, and an unknown male, UM1, who has never been identified, was the contributor of the semen found

in the victim's body. Although more items were tested post-conviction, the results are no different: in a case where no sexual assault was shown to definitively occur, and no related charges were put forth, UM1's semen was at the scene and the petitioners' DNA was not.[27]

In concluding the latest DNA evidence is cumulative, we are mindful of the following. Although petitioners advanced a single perpetrator theory *at trial*, the Commonwealth's case was limited to the charges of murder, burglary, and conspiracy, and it did not portray this event as a sex crime.

_____

[27] The other DNA results discussed herein are summarized in table 1, *supra*. Testing revealed that DNA originating from UM1 was found on Nickens's anal swab and bed sheet, as well as the green jacket and the red straw contained therein. *See* N.T., 7/25/23, Ex. JD6 (Keel Aff.), at 6. Other evidence tested, which did not contain DNA attributable to the petitioners or UM1, included Nickens's underwear, a blanket, a bath towel, and Nickens's nightgown. *See id* at 6. *Accord* N.T., 7/25/23, Ex. JD5 (FACL report), at 2 (summarizing the DNA typing results and focusing on the red straw, and cuttings, from the green jacket, and Nickens's bed sheet). No blood or semen was detected on Nickens's underwear, and the touch DNA could not be "interpreted as a coherent profile." *See* N.T., 7/25/23, at 116-17, 120. Prior to the first trials, the underwear was examined but no blood or semen was detected. *See id* at 117. According to Keel's testimony, touch DNA testing from 2021 supports the conclusion that UM1 is excluded from the DNA sample taken from Nickens's underwear. *See id* at 123-24. The bed sheet contained semen from UM1. *See id* at 60-61. No semen was detected on the towel, and it was not tested for PCRA purposes for touch DNA. *See id* at 129. Similarly, semen was not detected on the blanket, and it was not "processed any further." *Id* at 133. FACL's "primary focus" for the nightgown was "looking for semen," and they did not find any, nor did they look for touch DNA on the nightgown. *See id* at 153-54, 163. While Keel opined that UM1 must have touched the dress because Nickens was likely wearing it during the assault, there is no "evidence one way or the other" about whether he touched it. *See id* at 164-65, 174-76. FACL did not retest the anal swab. *See id* at 206.

While the Commonwealth acknowledged the DNA of UM1 in the victim's body, it emphasized the cause of death (blunt force trauma) and implicated the petitioners with several witnesses who overheard the petitioners discussing their involvement in the crime. Furthermore, in all of the post-conviction DNA testing the results again consistently show UM1's DNA only, and no new DNA is identified. This same information was previously considered by all three separate factfinders and rejected. Finally, ***none of the newly tested evidence either exculpates or inculpates the petitioners***. The post-conviction DNA tests results are thus cumulative of previously available and previously used evidence at trial.

To elaborate: after-discovered evidence is cumulative if it tends to prove material facts already in evidence at trial and is of the same grade or character of evidence. ***See Small***, 189 A.3d at 974. The petitioners' proffered evidence tends to prove material facts that were already in evidence: the person who deposited the semen in Nickens's body around the time of her murder was not any of the petitioners, and none of the items tested established their presence at the crime scene. These facts have been known to petitioners for approximately twenty-five years. Additionally, the evidence at issue is of the same character as that at trial, namely, DNA evidence. ***See id***. The re-testing of the evidence, notwithstanding advances in DNA testing over the years, just shows more of the same, *i.e.*, that UM1's DNA is present in certain items found at the scene and the petitioners' DNA is not; the after-discovered DNA

evidence of the straw and the bed sheet neither placed petitioners at the scene of the crime nor excluded them as being present.

Indeed, at their separate trials, each petitioner was in possession of evidence that he and his cohorts were all excluded by DNA evidence as contributors to the semen recovered from the victim's body, and it was argued by counsel for each petitioner. Accordingly, the PCRA court erred in finding that the subsequent DNA tests facilitated a ***previously unavailable*** single-perpetrator defense. To the contrary, as noted *supra*, the petitioners argued that Nickens was raped by her murderer, and because the DNA from the semen excluded them, they could not have murdered Nickens. The foregoing contradicts the PCRA court's determination that the "single perpetrator defense," *i.e.*, the defense that the person who deposited the semen was Nickens's killer, was ***unavailable*** at the time of the petitioners' trials. ***Contra*** PCRA Court Opinion, No. 3607-99 (Chappell), 6/18/24, at 6 (emphasis added). That defense was not only available to all three petitioners, but argued by each.[28]

We find our Supreme Court's holding in ***Murchison*** instructive. Murchison was convicted of first-degree murder for strangling his victim in a home the victim and others used for prostitution; he later sought PCRA relief

_____

[28] Further, by the time of Johnson's trial, it was known that the DNA from the jacket matched the DNA from the semen and excluded the petitioners.

based on new DNA test results that, he alleged, constituted after-discovered evidence. *See* 328 A.3d at 7. The Court concluded that new DNA testing establishing the victim's blood was found on a third-party's/co-resident's clothes was cumulative of evidence that the person who discovered Willis's body and shook her "blood-covered body to wake her up." *Id*. Similarly, here, DNA evidence was already addressed at petitioners' trials, namely, by the stipulations and testimony that the semen found in Nickens's body excluded the petitioners, but was not inconsistent with the petitioners' commission of the burglary and murder. Importantly, the Commonwealth did not advance this case as a sex crime. The petitioners were tried for murder, burglary, and conspiracy; and the Commonwealth was clear in its closings it was unsure how UM1's semen got to the crime scene and advanced several possibilities, but it did not allege rape or sexual assault. It was the defense theories that advanced the murderer and "rapist" were one in the same at each of the trials due to the semen of the UM1 at the scene, and the lack of the petitioners' DNA at the scene, a theory that three separate factfinders rejected. Thus, the PCRA court erred in cursorily concluding that this DNA evidence was not cumulative because it was "affirmative evidence, if believed by a jury, that [the petitioners] were not involved in this crime and that [UM1] was the perpetrator." PCRA Court Opinion, No. 3607-99 (Chappell), 6/18/24, at 6-7. Ironically, the PCRA court accepts the single-perpetrator theory presented to, and rejected by, the original factfinders.

Next, and independent of the cumulative nature of the new DNA test results, the petitioners also cannot show those results would likely compel a different verdict, because, as in **Murchison**, the evidence neither places them at the scene of the crime nor excludes them. **See** 328 A.3d at 19-20. The PCRA court, in its Rule 1925(a) opinion, failed to perform the necessary test of analyzing the "new evidence" in the context of all the inculpatory trial evidence. That evidence included: McElwee's testimony placing the petitioners in Nickens's home around the time she was murdered; the testimony that Grasty did not like the victim and had recently threatened her; and the testimony of other witnesses who either heard the crime being discussed before it occurred or after it was completed. **See generally** PCRA Court Opinion, No. 3607-99 (Chappell), 6/18/24. Additionally, the DNA evidence is of the same type of evidence already offered at trial, and consistent with the trial testimonial and documentary evidence known for nearly one-quarter century, namely, that the DNA tests excluded the petitioners and semen of UM1 was at the scene. **See Payne**, 210 A.3d at 302.

Further, the PCRA court implicitly and incorrectly assumes that evidence none of the petitioners had intercourse with the victim proves they did not burglarize her home or murder her; but, again, the Commonwealth never advanced this prosecution as a sex crime. The PCRA court regards evidence that the petitioners did not have sexual contact with the victim as tantamount

to proof they were not in her home, yet no expert offered such testimony.[29]

The absence of evidence they were involved in a possible sexual assault does not tend to prove they did not commit burglary, murder, or conspiracy. As previously stated by this court, "[I]n DNA as in other areas, an absence of evidence is not evidence of absence." *Commonwealth v. Heilman*, 867 A.2d 542, 547 (Pa. Super. 2005). In *Murchison*, post-conviction DNA testing revealed the absence of Murchison's DNA on a wooden slat left at the scene of the murder, but the slat was not the murder weapon. Our Supreme Court rejected Murchison's argument that the absence of his DNA on the slat was exculpatory, concluding that it was "evidentiarily neutral" because it neither implicated nor exculpated him, since it "neither placed Murchison at the scene of the crime nor excluded him." 328 A.3d at 19-20. As in *Murchison*—and as was the case at petitioners' trials—the DNA evidence of Nickens's sexual encounter around the time of her death neither places petitioners at the scene nor excludes them, and it neither implicates nor exculpates them of the *murder*. Thus, similar to *Murchison*, the witnesses' testimony that led each factfinder to convict all three petitioners is not undone by the post-conviction DNA testing evidence. *See id*. at 20.

---

[29] *Contra* Concurring and Dissenting Memorandum at 6, 7-8 (reasoning that the absence of Petitioners' DNA in the items tested is proof that it was "*physically impossible* for [them] to have been in Nickens' apartment or capable of murdering Nickens that night") (emphasis in original).

In sum, the after-discovered DNA evidence puts the parties and the Commonwealth in the same situation as they were at trial. Accordingly, based on the reasoning and analysis in *Murchison*, we hold that the recently tested DNA evidence also would not likely compel a different outcome.[30] In light of our Supreme Court's holding in *Murchison*, we conclude that the PCRA court erred as a matter of law in its legal analysis and in failing to review the trial record in conjunction with the post-trial DNA evidence and its conclusion that the petitioners' post-conviction DNA evidence constitutes after-discovered evidence and in granting the petitioners a new trial.

Order reversed. Jurisdiction relinquished.

Judge McLaughlin joins this Memorandum.

President Judge Lazarus files a Concurring/Dissenting Memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/22/2026

_____

[30] This holding is consistent with our standard of review, which provides that it is this Court's task to ascertain whether the PCRA court's findings are supported by the record and without legal error. *See Murchison*, 328 A.3d at 16 (stating the appellate standard of review); *cf*. *id* at 19 (holding the record supported the PCRA court's conclusion that new DNA evidence was not after-discovered evidence because it was cumulative and unlikely to compel a different verdict).